**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

INDECK POWER EQUIPMENT
COMPANY,

     Plaintiff,

v.

ASHLEY ENERGY, LLC,

     Defendant.

Case No. 21 C 1353

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Plaintiff Indeck Power Equipment Company brought this action against Defendant Ashley Energy, LLC for breach of contract based on allegations that Defendant damaged an industrial boiler leased from Plaintiff. After a five-day trial, the jury returned a verdict in Defendant's favor, finding that, although Defendant breached the lease, Plaintiff did not sustain damage as a result. For the reasons discussed below, the Court rules as follows on the pending post-trial matters: Plaintiff's renewed motion for judgment as a matter of law (Dkt. 200) is granted in part and denied in part; Plaintiff's motion for a new trial (Dkt. 201) is denied; Defendant's bill of costs (Dkt. 196) is granted in part and denied in part; Defendant's petition for fees and costs (Dkt. 197) is denied; and Plaintiff's petition for fees and costs (Dkt. 213) is denied.

## PROCEDURAL HISTORY

Plaintiff filed this lawsuit for breach of contract against Defendant on March 11, 2021. (Compl., Dkt. 1). Plaintiff asserted a single claim for breach of contract, based on allegations that Defendant failed to properly operate and maintain a leased boiler and returned it with significant damage beyond ordinary wear and tear (*Id.*) Defendant answered the complaint and filed counterclaims for fraudulent inducement and violation of the Illinois Consumer Fraud and

Deceptive Business Practices Act that were ultimately dismissed. (Ans. & Sec. Am. Countercl., Dkt. 100; Mem. Op. & Order, Dkt. 122). After nearly two years of highly contentious discovery, Defendant amended its answer to include an affirmative defense based on failure to mitigate damages. (Ans. & Am. Affirmative Defenses ("ADs"), Dkt. 148). The parties then filed and briefed summary judgment motions but ultimately withdrew them, and the case was set for trial, (Minute Entries, Dkts. 151, 152).

Plaintiff further sought to bar the testimony of Defendant's expert witnesses, but those motions were mostly denied, with only one conclusion barred. (Order, Dkt. 163). At the final pretrial conference, the Court granted in part and denied in part the parties' motions in limine and ruled orally on objections to proposed exhibits. (Minute Entry, Dkt. 176). A jury trial took place from Monday, October 21, 2024, to Friday, October 25, 2024. (Minute Entries, Dkts. 183, 185, 186, 187, 189).

## BACKGROUND

### I.   Trial Testimony and Evidence

Plaintiff is a company that rents and sells industrial boilers and related equipment. (Tr. 36).[1] On a very basic level, boilers take water and convert it into steam. (Tr. 37). It is essential that the quality of the water is high since dirty water inhibits and impairs operation of the boiler. (Tr. 39). The quality of water is referred to in terms of total hardness, which is the measure of certain minerals in the water. (Tr. 39). The American Boiler Manufacturers Association (ABMA) and American Society of Mechanical Engineers (ASME) set standards for total hardness of water

---

[1] Unless otherwise noted, references to "Tr." in citations are to the official trial transcript of the October 21-25, 2024 trial in this case, references to "PX" or "DX" are to the exhibits admitted at trial, (Dkts. 192 and 193), and page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer.

fed into boilers, both at 0.3 parts per million. (Tr. 40, 45, 1091-1092). Both organizations also recommend that boiler operators check the total hardness of feed water three times per day, once per shift, to prevent problems and damage to the boiler. (Tr. 44-45). Water treatment equipment is used to reduce the hardness of feed water to acceptable levels. (*Id.*)

Defendant is a power plant that provides steam to many buildings in downtown St. Louis, Missouri. (Tr. 392-393). In 2019, Defendant's plant flooded and some of its equipment was destroyed. (Tr. 266, 811). As a result, Defendant had to rent boilers to generate steam while that equipment was inoperable. (Tr. 266). Plaintiff and Defendant entered into a lease for a boiler, a water treatment trailer, and other related equipment starting in January 2020, for a minimum of three months at $57,500 per month. (PX 1 & 2; Tr. 49, 67, 932). Defendant's president and CEO, who is also a lawyer, reviewed and approved the lease. (Tr. 799-800, 809, 818-821).

In relevant part, the lease, which incorporated Plaintiff's December 31, 2019 proposal by reference, required Plaintiff to provide a "like-new" boiler and "new" water treatment trailer; supply a technician to supervise start-up and train Defendant's operators; give written notice of any damage and an opportunity to inspect it. (PX 1). It also allowed Plaintiff to determine what repairs or replacement to employ with respect to any damaged equipment. (PX 2). The lease stated that the replacement values were $1,760,000 for the boiler and $1,200,000 for the water treatment trailer. (PX 2).

For its part, Defendant was required to operate and maintain the Equipment consistent with customary and sound boiler industry practice; maintain ABMA boiler water guidelines during operation; pay the cost of all repairs and replacement parts regardless of the cause or type of damage or wear, other than those resulting from normal wear and tear; pay continued rent and interest until any damaged equipment was repaired or replaced; indemnify Plaintiff for all claims,

3

costs and expenses (including attorneys' and experts' fees) arising from or related to the lease; and pay attorneys' and experts' fees incurred by Plaintiff with respect to enforcement, litigation or breach of the lease. (*Id.*) All disputes, claims, and lawsuits relating to or arising from the lease were subject to the exclusive jurisdiction of federal and state courts in Cook County, Illinois. (*Id.*) Defendant has rented boilers from other vendors with similar lease terms before and after the boiler in this case. (Tr. 817).

After the equipment arrived at Defendant's plant, Plaintiff's service technician started-up the boiler and trained Defendant's staff on how to operate it. (Tr. 461). Although the technician had started-up 200-300 boilers, this was his first time starting up a water treatment trailer. (Tr. 460). The technician was there for several days troubleshooting various issues but eventually got the boiler up and running. (*See generally* Tr. 460-559).

One of the problems had to do with the readings on the "flowmeters," which measure how much water is going through the equipment. (Tr. 487). That information is used to calculate when to cycle the water treatment equipment, so that it can maintain the proper water hardness. (Tr. 487-488). In this case, the problem was that the amount of water going in did not match the amount coming out. (Tr. 488-489). Internal emails between the technician and other employees of Plaintiff during the start up show that there was confusion about the cause of the problems with the flowmeter. (DX 1; Tr. 555, 558-560, 564, 567-568, 636-638, 1033). Although the technician eventually got the boiler up and running and signed off on the service ticket as completed, he continued to exchange emails with another employee about the issues. (Tr. 559-560). One such email said, "Are we thinking [the equipment] will be good? I have already left the site with signed paperwork." (DX 1). The coworker responded, "Your guess is as good as mine. You are not on a plane yet............... You don't want this to come back and bite......" (*Id.*) According to Plaintiff's

technician, he briefly mentioned that there was a discrepancy between the flowmeter readings to Defendant's plant manager, but he did not remember discussing anything else about it. (Tr. 583-585).

Approximately one week after start-up was complete, one of Defendant's boiler operators sent the technician a text message noting issues with the water treatment trailer and hard water being sent into the boiler. (PX 23). As part of that exchange, the technician told the boiler operator: "Just an afterthought, when [it] is done regenerating, I can tell you how to block the water for it's paddle flow meter and you would pull it to check the paddle magnets for debris." (PX 23, Tr. 549-551). The technician did not recall speaking to the plant manager about cleaning the flowmeters during start-up or training. (Tr. 551). Defendant's third-party water treatment consultant noted some spikes in water hardness after that date, but the problem generally seemed to have resolved.

Defendant returned the equipment to Plaintiff in early April 2020. (Tr. 127). According to an internal email dated April 2, 2020, from Plaintiff's salesperson to Plaintiff's CEO, the salesperson summarized the rental as follows: "Although our rental equipment operated fine after the transportation and start-up fiasco, I am not too sure of our chances for repeat business? Although this was Indeck's first job where we Leased our [boiler] with a [water treatment trailer], the overall results were underwhelming. I hope our Team can learn from these shortcomings and not repeat our mistakes moving forward." (DX 6). Upon its return, Plaintiff's shop manager inspected the equipment and noticed a large amount of scale in the boiler and that a tank in the water treatment trailer was filthy. (Tr. 187-196, 209).

On April 14, 2020, Plaintiff sent an email notifying Defendant about the scale and debris, stating that samples of the scale had been sent for further testing because their standard chemical cleaner did not work, allowing Defendant to inspect the equipment within one week, and advising

Defendant that continuing rent, interest, and late fees would be charged. (PX 49). By July 2020, Defendant had communicated to Plaintiff its position that any damage to the boiler was caused by Plaintiff's own defective equipment, the technician's mistakes during start-up, or, more likely, a combination of the two. (PX 49 at 45-46; Tr. 146-147). To remove the scale, Plaintiff hydroblasted it and tested mild chemicals on it that did not work. (Tr. 79, 82, 202, 203). Plaintiff generally prefers not to use strong chemicals to clean boilers. (Tr. 240-241). Defendant, however, contended that chemical cleaning is an industry standard and also a cheap and easy way to do it, if done properly. (DX 84 at 52).

Eventually, on February 5, 2021, Plaintiff sent Defendant a letter detailing its position and seeking a total $579,223.44 for inspection and cleaning costs, continuing rent, and interest. (PX 49). Shortly after that, on February 11, 2021, Defendant filed suit against Plaintiff in Missouri. (Petition, Dkt. 13-1). Plaintiff then filed this action on March 11, 2021. (Compl.). On August 25, 2021, the Missouri action was dismissed. (Order, Dkt. 23-1). This action proceeded, and at trial Plaintiff ultimately sought $3,005,118 for replacement of the boiler, inspection, testing, and cleaning costs, 30 months of continuing rent, storage charges, and interest. (PX 62). The part of the boiler Plaintiff claims to have been damaged originally cost only $458,522. (DX 60; Tr. 134, 998-1000).

Defendant's expert, Tom McCartney, testified that he estimated it would cost $75,000-$100,000 Canadian dollars ($50,000-$70,000 United States dollars) to chemically clean the boiler. (Tr. 1156-1157). His estimate in this case was based on chemical tests on scale samples from water-blasting, drawings of the boiler, and a prior estimate he made to chemically clean another boiler previously rented by Plaintiff to another customer named Black Velvet. (Tr. 1147-1162). Mr. McCartney was not sure if Plaintiff had made the decision not to chemically clean the Black

Velvet boiler. (Tr. 1158). In addition, he did not know if the boiler rented by Black Velvet was smaller or larger than the boiler rented by Defendant, or whether Black Velvet ultimately cleaned or purchased the boiler. (Tr. 1160-1162).

Defendant's other expert, Michael Mariscalco, testified that the scale build up did not decrease the boiler's performance. (Tr. 1075-1076). Plaintiff's own consultant reported that there was no metallurgical degradation to the boiler's tubes. (DX 24; Tr. 142). In addition, testimony and evidence showed that Defendant rented and operated a boiler from another company, Wabash Power Equipment Company, during the same period as Plaintiff's, operated it the same way with the same water, and photos of the inside of each boiler showed they looked similar to each other. (DX 76; Tr. 303-305, 434-435, 888-928). According to Wabash's president, its boiler did not require any special cleaning or extra charges and was returned to the rental fleet after being returned by Defendant. (Tr. 888-928).

## II.  **Jury Instructions, Deliberations, and Verdict**

In pertinent part, the final jury instructions stated as follows:

**No. 15**
**Elements of a Breach of Contract Claim**

Plaintiff Indeck Power Equipment Company claims Defendant Ashley Energy, LLC breached a contract between them.

The elements of a breach of contract claim are:

1. Existence of a valid and enforceable contract;

2. Performance by Indeck;

3. Material breach by Ashley; and

4. Resultant damages to Indeck.

I will explain and define these legal terms elsewhere in these instructions.

***

**No. 16**
**Element 1 – Existence of a Valid and Enforceable Contract**

The parties agree that there is a valid and enforceable contract between Indeck and Ashley regarding the lease of a boiler and a mobile water treatment trailer.


**No. 17**
**Element 2 – Performance by Indeck**

As [to] the second element of a breach of contract claim, Indeck must prove, by a preponderance of the evidence, that it substantially performed all obligations required of it under the contract or had a valid excuse for not doing so.

Indeck's obligations under the contract included the following:

–  to deliver a **LIKE-NEW 75,000 PPH 395 PSIG Boiler** and **NEW 85,000 PPH Mobile Water Treatment Trailer**;

–  to provide an Indeck Power Service Technician to supervise the initial start-up by Ashley's operators and train Ashley's operating personnel;

–  to provide Ashley with written notice of any damages and give Ashley seven (7) days to inspect the damaged equipment; and

–  to determine what repairs or replacement to employ with respect to equipment that has been damaged and perform any and all repairs or make any replacements to the equipment.

When I say "substantially performed," I mean the honest and faithful performance of the contract in its material and substantial parts, with no willful departure from, or omission of, the essential elements of the contract. Indeck satisfied this standard if its performance did not defeat the objectives of the parties in making the agreement.

You will address this issue in Question 1A on your Verdict Form.

8

**No. 18**
**Element 3 – Breach by Ashley**

The third element of a breach of contract claim which Indeck must prove is Ashley's breach of the contract. To recover on its claim, Indeck has the burden to prove Ashley failed to do something the contract required it to do. Indeck claims that Ashley breached the contract by failing to comply with any one or more of Ashley's following contract obligations:

– operate and store the boiler and/or the trailer in a careful and proper manner;

– promptly notify Indeck if the equipment required any maintenance or repair;

– return the boiler and the trailer in the same condition as when received from Indeck, ordinary wear and tear excepted;

– use only duly trained and qualified operators to operate and maintain the boiler and/or the trailer consistent with customary and sound boiler industry practice;

– maintain ABMA boiler water guidelines during boiler operation, hot stand-by or layup conditions;

– pay Indeck the cost of all repairs and replacement parts regardless of the cause or type of damage or wear, other than those resulting from ordinary wear and tear; and

– pay Indeck continued rental payments under the contract until such time as the boiler and/or the trailer was repaired or replaced.

Ashley claims it did not breach the contract because it properly operated and maintained the boiler and trailer and, notwithstanding Ashley's own contract obligations and agreement, any damage to the boiler was a result of Indeck failing to perform its contractual obligation.

You will address this issue in Question 1B on your Verdict Form.

**No. 19**
**Element 4 – Damages**

The fourth element of Indeck's breach of contract claim is damages. You should not interpret the fact that I am giving instructions about damages as an indication that I have any opinion as to whether Indeck is entitled to damages. I am instructing you on damages only so that you will have guidance in the event you decide that Ashley is liable on Indeck's claim.

If you decide for Ashley on the question of liability, then you should not consider the question of damages.

If you find in favor of Indeck, you must then decide how much money, if any, would fairly compensate Indeck for Ashley's breach of contract. Indeck has the burden of proving, by a preponderance of the evidence, each element of damages claimed and that the damages occurred as a direct and natural result of Ashley's breach. In calculating Indeck's damages, you should determine that sum of money that will put Indeck in as good a position as it would have been in if both Indeck and Ashley had performed all of their promises under the contract.

Indeck seeks an award of costs and expenses relating to repair, replacement, and storage, unpaid rent, and contractual interest to date.

You will address this issue in Questions 1C and 2A on your Verdict Form.

\*\*\*

**No. 22**
**Verdict Form**

\*\*\*

You will now retire to deliberate. Your deliberations should continue as necessary during the same general hours that we have conducted trial, that is, weekdays between roughly 9:00 a.m. and 4:30 p.m. You may, however, deliberate until 6:00 p.m., when the building closes to the public. In providing you with this information, I intend no comment on the appropriate length of your deliberations; that is a matter for you, the jury, to determine.

(Jury Ins. at 5708-5714, Dkt. 188).

The jury retired to deliberate on Friday, October 25, 2024, at 4:04 p.m. (Tr. 1232). At approximately 5:40 p.m., the jury gave a note to the Court Security Officer indicating that they had reached a verdict. (Tr. 1233; Jury Note, Dkt. 191). The jury returned a verdict in Defendant's favor, finding that, although Plaintiff performed its contract obligations and Defendant breached the contract, Plaintiff did not sustain damage as a result of Defendant's breach. (Verdict Form at 6086, Dkt. 193). In pertinent part, the jury completed the Verdict Form as follows:

1. **Liability**:

   A. **Performance by [Plaintiff]**: Did [Plaintiff] prove it performed its obligations under the contract?

      ☑ **YES**          ☐ **NO**

      \*\*\*

   B. **Breach by [Defendant]:** Did [Plaintiff] prove [Defendant] breached the contract?

      ☑ **YES**          ☐ **NO**

      \*\*\*

   C. **Damages**: Did [Plaintiff] prove it sustained damage as a result of [Defendant]'s breach of the contract?

      ☐ **YES**          ☑ **NO**

      \*\*\*

(*Id.*) At Plaintiff's request, the Courtroom Deputy polled the jury, and each juror confirmed the verdict. (Tr. 1234-1235).

III. **Post-Trial Motions**

At the close of evidence, Defendant moved for judgment as a matter of law on Plaintiff's claim and a discrete issue regarding whether any ABMA materials were incorporated into the

lease,[2] Plaintiff moved for judgment as a matter of law on Defendant's affirmative defenses, and the Court took the motions under advisement. (Dkt. 189; Tr. 1125-1126, 1177-1178). After trial, Defendant filed a bill of costs and petition for fees and costs, and Plaintiff filed a renewed motion for judgment as a matter of law, motion for a new trial, and petition for fees and costs.

## DISCUSSION

### I. Plaintiff's Renewed Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50, a court may enter judgment as a matter of law against a party on a claim or defense if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on an issue essential to the claim or defense. Fed. R. Civ. P. 50(a). A party may move for judgment as a matter of a law against a party after the opposing party has been fully heard on an issue during a jury trial. *Id.* If an original motion for judgment as a matter of law is not granted, a party may renew the motion after trial. Fed. R. Civ. P. 50(b). "Because a Rule 50(b) motion is a renewal of the pre-verdict Rule 50(a) motion, it can be granted only on grounds advanced in the pre-verdict motion[.]" *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *3 (N.D. Ill. Dec. 3, 2015) (citing Fed. R. Civ. P. 50, advisory committee note, 2006 amendment).

In ruling on a Rule 50(b) motion, the court should review all of the evidence in the record, and all reasonable inferences must be drawn in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Evidence must be construed "strictly in favor of the party who prevailed before the jury and examine[d] . . . only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659

---

[2] In light of the verdict and this ruling, Defendant's motion is terminated as moot.

(7th Cir. 2012). The court must not make credibility determinations or weigh the evidence, and evidence favorable to the moving party that the jury was not required to believe should be disregarded. *Id.* If the evidence presented was sufficient to support the verdict under those standards, the verdict should stand. *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007). "[A] verdict supported by no evidence or a mere scintilla of evidence will not stand." *Martin v. Milwaukee Cnty.*, 904 F.3d 544, 550 (7th Cir. 2018).

After Defendant rested its case at trial, Plaintiff moved for judgment as a matter of law under Rule 50(a) on Defendant's remaining affirmative defenses,[3] arguing that Defendant failed to introduce any evidence in support of its defenses. (Tr. 1177-1178). After trial, Plaintiff renewed the motion under Rule 50(b).[4] It is undisputed that Defendant bears the burden of proof at trial on affirmative defenses. *Native Am. Arts, Inc. v. The Waldron Corp.*, 253 F. Supp. 2d 1041, 1045 (N.D. Ill. 2003) (citing *Publications Int'l., Ltd. v. Landoll, Inc.*, 164 F.3d 337, 339-340 (7th Cir. 1998).

## A.    Unconscionability (AD # 2) and Enforceability (AD # 7)

Defendant's Second and Seventh Affirmative Defenses assert that "[t]he Lease Agreement is both procedurally and substantively unconscionable, upon which grounds it may be rescinded[,]" and "[t]he provision of the Lease allowing Lessor to charge ongoing rental payments

---

[3] Defendant's First and Fourth Affirmative Defenses for fraudulent inducement and offset, respectively, are moot as a result of the Court's ruling dismissing Defendant's counterclaims.

[4] Defendant's Ninth Affirmative Defense asserts that Plaintiff failed to mitigate its damages by acting with reasonable diligence to attempt to clean the boiler after April 14, 2020, and by failing to repair the hard scale deposits it claims it detected in April 2020. (Ans. & Am. ADs at 4044). Although Plaintiff stated at trial that it was moving for judgment as a matter of law on all of Defendant's Affirmative Defenses, Plaintiff's renewed motion does not address failure to mitigate damages. (*See generally* JMOL Mot.). Plaintiff has therefore forfeited any argument regarding that affirmative defense. *See Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (defining forfeiture as failure to raise a timely argument). In any event, during trial, the failure to mitigate defense was addressed in both the Final Jury Instructions, and verdict form, and jury did not reach the issue. Accordingly, further discussion is unnecessary.

constitutes an unenforceable penalty." (Ans. & ADs at 4043-4044). Although unconscionability and enforceability of penalty provisions are distinct issues, the Court will address them together because they are conceptually related and the parties raised overlapping arguments.

"Unconscionability can be either 'procedural' or 'substantive' or a combination of both." *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 99 (2006). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* Lack of bargaining power is "more than [just] one party having a superior bargaining position[,]" it requires "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *CF Ent., Inc. v. Nielsen Co. (US), LLC*, No. 20 C 2393, 2023 WL 5289296, at *10 (N.D. Ill. Aug. 17, 2023) (quoting *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 23 (2006)). "[C]ourts 'are reluctant to rewrite the terms of a negotiated contract between businessmen' when considering the parties' relative bargaining positions." *CF Ent.*, 2023 WL 5289296, at *10 (quoting *Fusion Cap. Fund II, LLC v. Millenium Holding Grp., Inc.*, 590 F. Supp. 2d 1055, 1063 (N.D. Ill. 2008)). "Substantive unconscionability refers to those terms which are inordinately one-sided in one party's favor." *Id.* Generally, this means that "no one in his right mind would have agreed to" it. *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999). "Indications of substantive unconscionability are 'contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.'" *CF Ent.*, 2023 WL 5289296, at *10 (quoting *Kinkel*, 223 Ill. 2d at 28).

"In interpreting contract provisions that specify damages, Illinois law draws a distinction between liquidated damages, which are enforceable, and penalties, which are not." *Checkers Eight Ltd.*

*P'ship v. Hawkins*, 241 F.3d 558, 561-562 (7th Cir. 2001). "A clause is a[n] [enforceable] liquidated damages provision if: (1) the actual damages from a breach are difficult to measure at the time the contract was made; and (2) the specified amount of damages is reasonable in light of the anticipated or actual loss caused by the breach." *Id.* at 562. A clause is an unenforceable penalty provision "when the sole purpose of the clause is to secure performance of the contract[.]" *Id.* Where a plaintiff has been deprived of the use of personal property, one measure of damage for such loss is the reasonable rental value of the property for the period of deprivation. *Nisbet v. Yelnick*, 124 Ill. App. 3d 466, 471 (1st Dist. 1984); Ill. Pattern. Ins. 30.16 (Measure of Damages—Damage to Personal Property—Loss of Value).

  First, Plaintiff argues that Defendant waived its Second and Seventh Affirmative Defenses by agreeing that the lease was valid and enforceable in the Final Jury Instructions. (Jury Ins. at 5708). True, a stipulation by a party constitutes a judicial admission that has the effect of withdrawing a fact from contention and cannot be controverted post-trial. *Keller v. United States*, 58 F.3d 1194, 1198 & n.8 (7th Cir. 1995). But there is a distinction between withdrawing a fact from contention and waiving a legal defense. *See, e.g., McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 681 (7th Cir. 2002) (Rovner, J., concurring) (discussing distinction between statements of legal opinions and stipulations of fact); *Duvall v. Heart of CarDon, LLC*, 611 F. Supp. 3d 607, 617 (S.D. Ind. 2020) (same). Here, the effect of Defendant's stipulation that a valid and enforceable contract existed for the purpose of the jury instructions withdrew any factual disputes regarding the existence of a contract from the jury's purview, but it does not prevent Defendant from maintaining post-trial its legal position that the lease contains provisions that are unconscionable or unenforceable.

Second, Plaintiff contends that Defendant failed to present any testimony that the ongoing rent charged under the lease was unreasonably large in light of the actual loss. In response, Defendant maintains that Plaintiff's strict interpretation is procedurally unconscionable and the provision regarding Plaintiff's discretionary ability to charge rent in an amount exceeding the cost of the equipment while declining to clean and repair it is substantively unconscionable and further constitutes an unenforceable penalty clause. Defendant also contends that the lease as a whole is subject to recession due to unconscionability based on other provisions, including the reference to ABMA guidelines and Plaintiff's ability to employ non-industry standard cleaning and repair methods and charge attorney's fees and costs as a non-prevailing party. Plaintiff rejects Defendant's defenses of unconscionability and unenforceability on the grounds that Defendant is a sophisticated commercial party, Defendant agreed to provisions similar to some of those present in the lease with other boiler lessors, Defendant's president admitted that he understood some of the provisions at issue, and the ongoing rent provision's purpose was not solely to secure performance.

Regarding unconscionability, the evidence unequivocally showed that Defendant is a sophisticated commercial party, Defendant's CEO, a lawyer, reviewed and approved the lease, and Defendant agreed to other leases with similar terms. (*See, e.g.*, JMOL Reply, Ex. B, Dkt. 211-2). As to the enforceability of the ongoing rent provision, Defendant did not present evidence or argument that such a provision, as written, is unconscionable. Of course, the reasonableness of Plaintiff's interpretation or exercise of discretion in connection with that provision (and others Defendant argues are unconscionable) is another matter that is not relevant to whether the language of the clause itself is unenforceable. For these reasons, the Court concludes that Plaintiff is entitled to judgment as a matter of law against Defendant on its Second and Seventh Affirmative Defenses

of unconscionability and unenforceability because a reasonable jury would not have a legally sufficient evidentiary basis to find for Defendant on issues essential to those defenses. Plaintiff's renewed motion for judgment as a matter of law is therefore granted as to Defendant's Second and Seventh Affirmative Defenses.

## B.     Cause of Damages (AD # 3)

Defendant's Third Affirmative Defense asserts that "[a]ny damages suffered by Indeck, if any, were the direct and proximate result of its own acts or omissions and/or the acts or omissions of its agents and representatives." (Ans. & Am. ADs at 4043). Plaintiff argues both that this is simply an element of Indeck's claim, not an affirmative defense, and that the jury explicitly rejected this defense when it determined that Defendant breached the lease. Defendant concedes that Plaintiff "is not entirely wrong that this affirmative defense is simply an element of [Plaintiff's] claim[.]" (JMOL Resp. at 9951, Dkt. 209). However, because the jury found that Plaintiff did not "prove it sustained damage as a result of [Defendant]'s breach[,]" (Verdict Form at 6086), Defendant disputes Plaintiff's contention that the jury's verdict shows that they rejected the defense.

An affirmative defense that merely denies an element of a claim is no affirmative defense at all and should therefore be stricken. *See, e.g., Ocean Atl. Dev. Corp. v. Willow Tree Farm L.L.C.*, No. 01 C 5014, 2002 WL 485387, at *4 (N.D. Ill. Mar. 29, 2002) (striking affirmative defenses of "lack of causation" because they merely denied an element of the plaintiff's claims). Indeed, to meet the technical definition of an affirmative defense, a defendant must assert a matter outside of a plaintiff's complaint. *LaSalle Bank Nat'l Assoc v. Paramont Props.*, 588 F. Supp. 2d 840, 860 (N.D. Ill. 2008).

While Defendant's Third Affirmative Defense denies the causal element of Plaintiff's claim, it also asserts an affirmative matter outside of the complaint—Plaintiff's alleged role in causing damage to the boiler. Indeed, at trial, Defendant presented evidence and testimony regarding its theories that Plaintiff's provision of defective equipment, botched installation, and failure to properly clean and repair all played a role in causing any damage to the boiler. Furthermore, despite Plaintiff's assertion to the contrary, the jury's verdict in no way rejected this defense. The jury found that Plaintiff did not "prove it sustained damage as a result of [Defendant's] breach[.]" (Verdict Form at 6086). That portion of the verdict form related to whether Plaintiff had satisfied its burden of proof as to whether Defendant's breach caused damage, not if Plaintiff's own acts or omissions were the cause of the damage it claimed. In fact, the finding that Plaintiff did not sustain damage as a result of Defendant's breach leaves open the possibility that any damage sustained may have been caused by Plaintiff. For these reasons, a reasonable jury would have a legally sufficient evidentiary basis to find for Defendant regarding causation of any damage and Plaintiff's renewed motion for judgment as a matter of law is denied as to Defendant's Third Affirmative Defense.

## C.    Waiver or Estoppel (AD # 5)

Defendant's Fifth Affirmative Defense asserts that, "[b]y virtue of its own inaction, [Plaintiff] has waived or is otherwise estopped from pursuing its damages claims." (Ans. & Am. ADs at 4043). "The party claiming an implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130 (2d Dist. 2000). To prevail on an estoppel defense, a party must show: "(1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the

representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party." *In re Krueger*, 192 F.3d 733, 740-741 (7th Cir. 1999) (quoting *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 987 (1st Dist. 1997)).

Plaintiff argues that Defendant failed to introduce any evidence of any statement or action that would give rise to waiver or estoppel. To the contrary, Plaintiff maintains that the evidence showed that Plaintiff asserted its rights under the lease by continuing to bill Defendant rent after the equipment had been returned. Defendant responds that Plaintiff's failure to communicate for approximately six months after Defendant informed Plaintiff that it dispute the cause of damage to the boiler and decision to avoid reasonable repairs (i.e., chemical cleaning) is sufficient to support the defenses of waiver and estoppel.

The Court agrees with Plaintiff as to Defendant's Fifth Affirmative Defense. Defendant did not introduce sufficient evidence for a reasonable jury to find that Plaintiff's words or actions clearly, unequivocally, and decisively manifested an intention to waive its rights under the lease or such that Plaintiff should be estopped from enforcing them. Despite any evidence of a temporary break in communication between the parties or the reasonableness of Plaintiff's decision to pursue one method of repair over another, Plaintiff continued to charge Defendant rent, thereby indicating that it did not intend to waive any rights. In light of that, a reasonable jury could not conclude that Plaintiff waived or should be estopped from enforcing is rights under the lease. Accordingly, Plaintiff's renewed motion for judgment as a matter of law is granted as to Defendant's Fifth Affirmative Defense for waiver or estoppel.

### D.     Laches (AD # 6) and Unclean Hands (AD # 8)

Defendant's Sixth and Eight Affirmative Defenses assert that Plaintiff's claims are barred by the doctrine of laches due to its delay in bringing this lawsuit and by the doctrine of unclean hands. (Ans. & Am. ADs at 4043-4044). Defendant does not oppose Plaintiff's argument that the doctrines of laches and unclean hands are inapplicable to Plaintiff's claims because they seek monetary damages, not equitable relief. *See W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 928 F. Supp. 2d 976, 986-987 (N.D. Ill. 2013) (finding that affirmative defenses of laches and unclean hands failed as a matter of law because claims sought monetary damages), *aff'd on other grounds*, 794 F.3d 666 (7th Cir. 2015). Accordingly, Plaintiff is entitled to judgment as a matter of law on Plaintiff's Sixth and Eight Affirmative Defenses of laches and unclean hands.

## II.     Plaintiff's Motion for a New Trial

Plaintiff argues that a new trial is warranted because (A) the jury's finding that Plaintiff did not "prove it sustained damage as a result of [Defendant's] breach" is either against the manifest weight of the evidence or an impermissible "compromise verdict" and (B) Plaintiff was not allowed to present expert rebuttal evidence regarding the cost of cleaning the boiler. Neither argument is persuasive.

### A.     Jury Verdict

Under Federal Rule of Civil Procedure 59(a), a court may grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Seventh Circuit has stated that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (quoting *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)). To determine whether a jury's verdict

is against the manifest weight of the evidence, courts consider the "general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011). A verdict will stand unless "no rational jury" could have returned it. *Moore ex rel. Est. of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008).

In some instances, a new trial may be warranted if the court determines that the jury's verdict resulted from an impermissible compromise. A so-called "compromise verdict" occurs "when jurors resolve their inability to reach a determination with any certainty or unanimity on issues of liability by awarding a party inadequate damages." *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1082 (7th Cir. 1998). Factors to consider in determining whether a verdict is the result of a jury compromise include a grossly inadequate damages award, a close question of liability, and an odd chronology of jury deliberations. *Id.* at 1083. The overarching consideration, however, requires the court to view the record in its entirety for a clear demonstration of the compromise character of the verdict. *Id.*

Plaintiff's primary argument for a new trial is that the jury's answer to Verdict Form Question 1C regarding resultant damage is against the manifest weight of the evidence. Specifically, Plaintiff claims that the jury's answers to Questions 1A and 1B regarding Plaintiff's performance and Defendant's breach necessarily mean that Plaintiff sustained damage as a result of Defendant's breach. In addition, Plaintiff asserts that it presented ample evidence of resultant damage that was uncontested and therefore should not have been disregarded. According to Plaintiff, these inconsistencies warrant a new trial on damages. Alternatively, even if the jury's verdict is compatible with the evidence, Plaintiff contends that the jury entered a "compromise verdict" requiring a new trial on both liability and damages.

Jury Instruction No. 17 stated that Plaintiff must prove that it substantially performed all its obligations under the contract, listed several relevant obligations, and defined substantial performance. In turn, Jury Instruction No. 18 stated that Plaintiff must prove that Defendant failed to do something the contract required it to do and listed seven specific obligations Plaintiff claimed that Defendant breached. Finally, Jury Instruction No. 19 stated, among other things, that Plaintiff must prove that any damage occurred as a direct and natural result of Defendant's breach. Plaintiff now argues that by proving that Plaintiff performed under the contract and Defendant breached the contract, it necessarily follows that Plaintiff proved that it sustained damage as a result of Defendant's breach. Not so.

First of all, Plaintiff's argument is entirely inconsistent with the elements of a breach of contract claim under Illinois, which the Jury Instructions and Verdict Form—that Plaintiff did not object to—were based on. Under Illinois law, the elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Gonzalzles v. Am. Exp. Credit Corp.*, 315 Ill. App. 3d 199, 206 (1st Dist. 2000). Performance, breach, and resultant injury (or damage) are independent elements, each of which must be proven by a plaintiff to prevail. On its face, Plaintiff's argument that the jury found that it had established performance and breach and therefore it necessarily had also proven resultant injury or damage would effectively eliminate the final element and thus can be rejected for that reason alone. As Defendant points out, if Plaintiff were right, then Verdict Question 1C "would have been unnecessary and surplusage." (New Trial Resp. at 9964, Dkt. 210).

Looking closer at Plaintiff's actual argument, it fares no better. According to Plaintiff, the jury's finding that Plaintiff performed under the contract necessarily means that the jury found that

it proved its equipment was damaged because some of Plaintiff's obligations under the contract were to provide written notice of any damage, determine what repairs or replacements to make for damaged equipment, and perform any such repairs or make any such replacements. But that position is untenable. Indeed, a finding that Plaintiff performed under the contract by doing those things does not necessarily mean that the jury also found that any damage was caused by Defendant or even constituted damage beyond normal wear and tear.

Similarly, Plaintiff views the jury's finding that Defendant breached the contract as an indication it also necessarily rejected Defendant's argument that any damage to the equipment was a result of Plaintiff's non-performance. Specifically, Plaintiff points to the seven specific contract obligations listed in Jury Instruction No. 18 regarding Defendant's breach and the paragraph following that list, which states that "[Defendant] claims it did not breach the contract because it properly operated and maintained the boiler and trailer and, notwithstanding [Defendant]'s own contract obligations and agreement, any damage to the boiler was a result of [Plaintiff] failing to perform its contractual obligation." True, the jury's finding that Plaintiff performed its obligations under the contract seemingly indicates that the jury rejected any argument that any damage was the result of Plaintiff's non-performance. Nevertheless, the remainder of Plaintiff's argument defies both logic and the language of the instruction.

In essence, Plaintiff insists that the sentence, "[Defendant] claims it did not breach the contract because it properly operated and maintained the boiler and trailer", means Defendant denied only one of the seven listed allegations of breach and therefore concedes the rest. If that were the case, then there would have been no reason to list seven ways in which plaintiff contends Defendant breached the contract. Instead, they would have been submitted to the jury as agreements or stipulations. Furthermore, the sentence, "[Defendant] claims it did not breach the

contract because it properly operated and maintained the boiler and trailer", addresses many of the seven listed allegations of breach and was not included in the instruction to operate as a concession of any allegations not expressly denied.

With respect to Jury Instruction No. 18 and Verdict Question 1B, Plaintiff also asserts that Defendant conceded in its closing argument that it breached the lease in several ways and that Plaintiff sustained damage as a result. This argument completely mischaracterizes and misquotes Defendant's position. Yes, Defendant stated, "the total amount of damages that [Plaintiff] incurred should have been $50,000." (Tr. 1227). But the entire sentence reads, "*So if you're evaluating damages in this case, which I would submit you shouldn't get there,* the total amount of damages that [Plaintiff] incurred should have been $50,000." (*Id.*) (emphasis added). Defendant was clearly making a conditional and alternative argument that *if* the jury found for Plaintiff on liability, which it ultimately did not, then it could calculate damages to be only $50,000. This contention merits no further discussion.

More broadly, the Court finds that the jury's answers to Questions 1A, 1B, and 1C were logically compatible and also supported by sufficient evidence. Indeed, as Defendant argues, there is no reason why a jury in a breach of contract case could not find that plaintiff performed and defendant breached, but plaintiff did not suffer damages as a result of defendant's breach. *See, e.g.*, *Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Distribution, Inc.*, 861 F.3d 633, 635 (7th Cir. 2017) (noting various possible conclusions the jury could have reached in finding that defendant had breached a contract but plaintiff had no damages); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordination Pretrial Proc.*, No. 14 C 1748, 2017 WL 6569632, at *7 (N.D. Ill. Dec. 22, 2017) (distinguishing the fraudulent misrepresentation claim at

issue from "a breach-of-contract case, for example, where it is possible for a jury to find that the defendant breached its obligations without injuring the plaintiff.").

Here, Defendant advances several rational explanations for the jury's determination. For example, the jury could have concluded that Plaintiff simply did not prove that any damage "occurred as a direct and natural result of [Defendant]'s breach[.]" (Jury Ins. at 5711). There was more than sufficient evidence to support this conclusion, including evidence of problems with start-up, flowmeters, and Plaintiff's decisions regarding repair methods. Any or all of those issues could have been viewed by the jury as the cause of any damage to the equipment, as opposed to whatever breach it determined Defendant to have committed. The jury also could have decided that Defendant breached the contract by failing to adhere to the proper water treatment standards but concluded that such failure did not result in any damage or any damage was caused by something else.

Moreover, despite Plaintiff's insistence, the conclusion that the problems noted above were the cause of the damage is not inconsistent with the jury's finding that Plaintiff performed its obligations under the contract. As summarized in Jury Instruction No. 17, Plaintiff was obligated to provide a like-new boiler and new water treatment trailer. The jury could have found that Plaintiff did, in fact, provide such equipment, but that it contained defective components (i.e., flowmeter) that caused any damage. Similarly, the jury could have found that Plaintiff provided a technician to supervise start-up and train Defendant's personnel, but that the technician also did things that caused any damage.

Overall, the Court finds the jury also had a rational basis to conclude that Plaintiff simply did not sustain any damage from Defendant's breach. Evidence and testimony presented by Defendant is sufficient to support a finding that the scale build-up on the boiler did not affect its

performance, did not damage the metal components, and could be easily and cheaply cleaned. In addition, compelling evidence of the Wabash boiler that operated at the same time under the same conditions as Plaintiff's boiler and having essentially the same scale build up but not requiring any significant repair let alone replacement could have led the jury to conclude that, in the industrial boiler context, the level of scale build up here either did not constitute damage at all and/or was considered normal wear and tear.

In light of the foregoing discussion, Plaintiff's related argument that it presented uncontroverted evidence of the amount of damages is irrelevant. Because the jury had a rational basis to conclude that Plaintiff did not sustain any damages or that damage was not the result of Defendant's breach, the jury had no reason to reach the issue of calculation of damages. However, to the extent that any such evidence or testimony was "uncontroverted," while the Court agrees that the jury would not have been entitled to disregard it, the jury was still duty-bound to consider the credibility of the witnesses and decide what weight to give their testimony.

Next, the Court summarily rejects Plaintiff's contention that the timing of jury deliberations affected the outcome of the trial. As an initial matter, both parties represented on multiple occasions throughout the case that they anticipated this trial to take no more than five days. (*See* Joint Initial Status Report at 172, Dkt. 18; Final Pretrial Order at 5396, Dkt. 171; Mar. 28, 2024 Minute Entry, Dkt. 124). At the setting of the trial, the final pretrial conference, and throughout the trial, the Court repeatedly reminded counsel that, based on their representations, five full days had been set aside on the Court's calendar, the jury had been told that the estimated duration of the trial was five days, and counsel needed to work together to get the case to the jury by Friday afternoon to at least begin deliberations. (Oct. 10. 2024 Tr. 46; Tr. 59, 387, 662, 1132). At the

same time, the Court emphasized to counsel that the jury would be given as much time as needed to deliberate and the courtroom would be available Monday or later if necessary. (*Id.*)

The trial started on Monday, October 21, 2024, and ended five days later on Friday, October 25, 2024. It should therefore come as no surprise to Plaintiff that the jury reached a verdict exactly within the time range the parties anticipated. However, more importantly, the Court stated on the record and in the jury instructions when jury deliberations should occur, when the building closes, and that such information should not be taken as a comment on the proper length of deliberations, because that is a matter for the jury to decide. "There is a rebuttable presumption that the jury followed [the Court's] instructions." *United States v. Garcia*, 81 F.4th 691, 698 (7th Cir. 2023) (citing *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019)). "A [party] can overcome the presumption by showing there is an 'overwhelming probability' that the jury did not or could not follow an instruction." *Id.* (citing *United States v. Gallardo*, 497 F.3d 727, 736 (7th Cir. 2007)). Here, the jury was made aware that they were able to return to the courthouse to resume deliberations on the following business day if they were not complete. That option was ultimately unnecessary. Besides speculation, Plaintiff has not come forward with any showing that the jury did not follow instructions or that the timing of deliberations in any way affected the verdict.

Finally, considering the rulings above and in view of the record as a whole and relevant factors, the Court finds nothing to indicate that the jury's verdict is the result of an impermissible compromise. Rather, it appears that the jury carefully considered and following the instructions given and reached the conclusion that the resultant damage element of the liability portion of the breach of contract claim had not been proven by Plaintiff by a preponderance of the evidence.

For all these reasons, the Court concludes that the jury's verdict was logically compatible and did not indicate any confusion or abuse of power. This is not a case where the jury found the defendant liable for breach of contract but awarded no damages. Here, the jury appears to have focused on one of the many hotly contested issues in this case—resultant damage—and found in favor of Defendant. As discussed, there were multiple rational bases from which the jury could have reached that conclusion.

### B. **Expert Rebuttal Evidence**

Plaintiff also argues that a new trial should be ordered because it was prevented from introducing evidence that would have contradicted, impeached, or defused the impact of Defendant's expert witness, Mr. McCartney, regarding boiler cleaning methods and costs. Having considered the arguments, the Court finds no reason to conclude that its ruling was erroneous. But, even if it was, there is little chance it affected the outcome of the trial given the jury's verdict.

Under Federal Rule of Civil Procedure 61, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Thus, a motion for a new trial based on an erroneous evidentiary ruling should only be granted if there is a "significant chance . . . that the ruling affected the outcome of trial. *Nelson v. City of Chicago*, 810 F.3d 1061, 1066 (7th Cir. 2016) (quoting *Maurer v. Speedway, LLC*, 774 F.3d 1132, 1135 (7th Cir. 2014)); *see also Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023) ("[W]e will reverse an evidentiary ruling only when we are left with a firm conviction that the district court's error could have affected the jury's decision."); *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005)

("A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, . . . and the result is inconsistent with substantial justice."); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) ("[A party] is entitled to a fair trial, but not a perfect one."). In addition, if a motion for a new trial is based on the "cumulative effect" of multiple errors at trial, the movant "must show: '(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [their] trial fundamentally unfair.'" *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (quoting *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011)).

Defendant's expert, Mr. McCartney, testified that he estimated it would cost $50,000-$70,000 U.S. dollars to chemically clean the boiler. During cross-examination by Plaintiff, Mr. McCartney testified that his estimate in this case was based on chemical tests on scale samples from water-blasting, drawings of the boiler, and a prior estimate he made to chemically clean the Black Velvet boiler. (Tr. 1160-1162). Plaintiff asked Mr. McCartney if, during his deposition, he believed that Plaintiff had said no to cleaning the boiler but that belief turned out to be incorrect, to which Mr. McCartney responded that he was not sure. (Tr. 1158). Mr. McCartney additionally conceded that he did not know if the boiler rented by Black Velvet was smaller or larger than the boiler rented by Defendant, or whether Black Velvet ultimately cleaned or purchased the boiler. (Tr. 1160-1162).

Then, during the direct examination of Plaintiff's owner and president, Martha Forsythe, Plaintiff sought to introduce evidence to show that Black Velvet ultimately purchased the boiler from Plaintiff for $1,000,000 instead of chemically cleaning it. According to Plaintiff this evidence would have rebutted Mr. McCartney's testimony by contradicting, impeaching, and defusing its impact. *See United States v. Papia*, 560 F.2d 827, 848 (7th Cir. 1977) ("The proper function of

rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."). Specifically, Plaintiff argues that the $1,000,000 purchase price shows that Mr. McCartney's $50,000 estimate was off by a factor of twenty. Defendant objected on relevance grounds, and the Court sustained the objection because Mr. McCartney had testified that he was not sure whether Plaintiff made the decision not to clean the Black Velvet boiler.

Indeed, evidence regarding the price another customer paid to purchase, not clean, a different boiler under different circumstances was beyond the scope of Mr. McCartney's testimony and irrelevant to his estimate as to the cost to clean the boiler in this case. To allow such evidence during direct examination of another witness, after Mr. McCartney already said he knew nothing about it and Plaintiff did not ask him any other questions about it, would have interjected irrelevant information into the case, caused needless delay, and confused the jury regarding the issues here. Contrary to Plaintiff's assertion, Ms. Forsythe's testimony about Plaintiff's sale of the boiler to Black Velvet would not have contradicted, impeached, or even defused Mr. McCartney's testimony because he said he was not sure if the boiler was ultimately cleaned or purchased. With respect to the Black Velvet boiler, Mr. McCartney simply testified that he used his estimate to clean it as part of his analysis in generating the estimate to clean the boiler rented by Defendant. Plaintiff had ample opportunity to question Mr. McCartney about the cleaning proposals for the boilers rented by Defendant and Plaintiff during cross-examination. The Court's decision to exclude irrelevant evidence outside the scope of that questioning during the direct examination of a different witness was not erroneous.

Nevertheless, even assuming such evidence should have been allowed, the Court is not convinced that it would have made any difference in the outcome of the trial. Critically, the jury found that Plaintiff failed to prove that it sustained damages as a result of Defendant's breach. Mr.

McCartney's testimony was limited to cleaning methods and costs, which would have been relevant to the calculation of damages, but not causation of damage. Because the jury found that Defendant did not cause damage to Plaintiff's boiler, it is likely that Mr. McCartney's testimony, and therefore any excluded "rebuttal" evidence, had little or no effect on its verdict.

Accordingly, Plaintiff's motion for a new trial on the basis that was improperly prevented from introducing expert rebuttal evidence is denied.

### III.    Fees and Costs

The final matters before the Court are the parties' requests for fees and costs. Plaintiff, taking the position that the lease allows it to recover fees and costs regardless of the outcome of the trial, seeks $927,874.12 in fees and $195,005.40 in costs. For its part, Defendant seeks $35,241.68 in fees and costs based on Magistrate Judge Susan E. Cox's April 5, 2023 Order granting Defendant's motion to compel. Both requests will be denied. Defendant's request for $36,214.77 in costs pursuant to Federal Rule of Civil Procedure 54(d)(1) will be granted in part.

### A.    Plaintiff's Petition for Fees and Costs

With respect to attorneys' fees and costs, the parties' lease provides as follows:

> 13.  Lessee . . . shall defend, indemnify, and hold Lessor . . . harmless for or from . . . for any and all claims, costs, expenses (including attorneys' and experts' fees) suits, demands, damages, liens . . . and liabilities arising from or related to this Lease, [and], the obligations of Lessor and Lessee . . . .
>
> ***
>
> 17. . . . Lessee further agrees that upon a default or breach, Lessee shall immediately pay to Lessor any and all costs and expenses related to the repair, transportation, storage, sale or lease of the Equipment and such other charges, fees and expenses and taxes plus reasonable attorneys' and experts' fees incurred by Lessor

> with respect to the repossession of the Equipment, enforcement, litigation or breach of this Lease.
>
> ***

(PX 2).

Based on these provisions, Plaintiff argues that it is entitled to a total of $1,122,879.52 in attorneys' and experts' fees and costs incurred in connection with obtaining dismissal of the petition filed by Defendant against Plaintiff in Missouri, dismissal of Defendant's counterclaims in this action, and a jury verdict that Defendant breached the lease. And even if fees and costs for its claims in this action are not recoverable under Paragraph 17 of the lease, Plaintiff maintains that Paragraph 13 at least entitles it to fees and costs incurred defending itself in the Missouri litigation and against Defendant's counterclaims in this case. Because neither side has been able to find case law interpreting the exact contractual language at issue, Plaintiff argues that the canons of contractual interpretation mandate an award of fees and costs in its favor. In addition, Plaintiff cites various cases in which a party was awarded fees and costs despite not having obtained a judgment against the opposing party. None of those cases, however, involved a non-prevailing party obtaining an award of fees and costs after having lost at trial. Defendant, for its part, opposes Plaintiff's petition on the basis that an award of fees and costs to a non-prevailing party, regardless of the contractual language, would be unreasonable and impermissible under Illinois law.

The Court starts by observing the longstanding general "American rule" that a party to litigation bears its own fees and costs. *Webb v. Fin. Indus. Regul. Auth., Inc.*, 889 F.3d 853, 857 (7th Cir. 2018); *Scholtens v. Schneider*, 173 Ill. 2d 375, 384 (1996). Of course, "[t]he parties to a contract may alter this rule, but contract provisions regarding attorney fees should be strictly construed and enforced at the discretion of the trial court." *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2d Dist. 2001). However, there is "a limitation implicit in these earlier

cases [enforcing a fee-shifting provision]—that attorney fees may only be awarded to a prevailing party." *Id.* at 516. In determining whether a party petitioning for fees prevailed, courts consider whether it succeeded or "failed on the 'most significant claim' and [if] the case was 'essentially a draw.'" *Id.* at 515 (quoting *Raffel v. Medallion Kitchens of Minn., Inc.*, 139 F.3d 1142, 1147 (7th Cir. 1998)); *see also Blue Book Servs., Inc. v. Amerihua Produce, Inc.*, 337 F. Supp. 3d 802, 810 (N.D. Ill. 2018) ("it is a simple matter of contract interpretation (and common sense) that a non-prevailing party would not be entitled to fees"); *Bank of Am., N.A. v. Oberman, Tivoli & Pickert, Inc.*, 12 F. Supp. 3d 1092, 1101 (N.D. Ill. 2014) (noting Illinois case law stating that attorney fees may only be awarded to a prevailing party and concluding, therefore, that "it would be unreasonable for the Court to award attorneys' fees to a non-prevailing party[.]") (citing *Atlantis Prods., Inc. v. Meridian Fence & Sec., L.P.*, 2012 IL App (2d) 110521-U, at *9, 2012 WL 6968326; *City of Harvard v. Elvis J. Henson Tr.*, 2012 IL App (2d) 120091-U, at *21, 2012 WL 6969339; *Powers*, 326 Ill. App. 3d at 516).

Here, although Plaintiff obtained dismissal of Defendant's original action in Missouri and the counterclaims in this case, Plaintiff ultimately did not succeed on the merits of its breach of contract claim. Plaintiff thus failed on the "most significant claim" and there is no serious argument that Plaintiff is the prevailing party in this dispute. Indeed, Plaintiff succeeded only on preliminary and ancillary matters, achieved no real benefit in bringing the suit, did not receive a judgment in its favor on the most significant claim in the case, and did not obtain any recovery. *See Raffel*, 139 F.3d at 1147 ("A party can be considered a 'prevailing party' for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit, receives a judgment in his favor, ... or by obtaining an affirmative recovery.") (quoting *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Tr. Co.*, 240 Ill. App. 3d 737, 753 (1st Dist. 1992).

Accordingly, under these circumstances, Plaintiff cannot be considered a prevailing party and therefore is not entitled to any fees or costs. Tellingly, Plaintiff was unable to cite a single case where a party sued another to enforce a contract, lost on the merits after a jury trial, and then still recovered fees and costs under a fee-shifting provision in the contract. The Court did not locate any supporting case law in its research either. Accordingly, the Court has no reason to conclude that this case should set that type of unusual precedent.

### B. Defendant's Petition for Fees and Costs

On April 5, 2023, Judge Cox, to whom discovery supervision had been referred, entered an Order granting in part and denying in part Defendant's motion to compel certain document collection and production. (Order, Dkt. 85). Essentially, because Plaintiff's original document collection and production was "incomplete and slapdash[,]" it was ordered to search the records of several custodians for certain key words and then produce any new responsive, relevant, and non-privileged documents. (*Id.* at 1706). In so ruling, Judge Cox generously noted that she was "not blaming counsel or [Plaintiff] for this failure. [Plaintiff] changed counsel during a crucial period of discovery, and it is not unusual for issues like this to arise when a case is transferred to new counsel." (*Id.* at 1708 n.2). Previously, while discussing a related issue at trial, the Court noted that it had reviewed Judge Cox's April 5, 2023 Order and her opinion that the deficiencies of the original production did not appear to be intentional and instead likely due to the change in counsel. (Tr. 1120-1121).

Defendant now seeks an award of fees and costs totaling $35,241.68, which represent time spent working on the motion to compel, taking depositions that had to be redone after Plaintiff supplemented its production pursuant to the April 5, 2023 Order, and photocopying costs related to those depositions. Plaintiff objects on the basis that the request is untimely under Federal Rule

of Civil Procedure 72(a), Defendant sought a monetary sanction in its motion but decided not to expressly request attorneys' fees, Judge Cox found Plaintiff's failure to originally produce the documents to be unintentional, and the rates and amounts sought are unreasonable.

In the underlying motion, Defendant requested that the Court order "that Plaintiff pay Defendant an appropriate sanction in an amount to be determined by the Court[.]" (Mot. to Compel at 850, Dkt. 71). In its reply, Defendant argued that the Court should order Plaintiff to "re-do its electronic document collection and, depending on what is discovered thereby, thereafter impose appropriate sanctions[,]" and stated that it would "await the outcome of that correction before determining whether to seek further sanctions." (Reply at 1556 & 1563) (citing case law referring to sanctions, including costs and attorneys' fees associated with failure to make timely production). Judge Cox's order did not expressly discuss sanctions, including any fees or costs, in connection with her ruling on the motion to compel. However, her comment that she was "not blaming counsel or [Plaintiff] for this failure" was clearly aimed at Plaintiff's threats regarding future requests for sanctions.

Based on the history of this case, the parties' briefs on this petition, the underlying briefs on the motion to compel, and Judge Cox's order, the Court concludes that an award of fees and costs is not warranted. Defendant appears to have been careful to avoid expressly asking for fees and costs in connection with the motion to compel and the April 5, 2023 Order made no ruling on the matter. As such, Plaintiff's argument that the petition is now untimely for failure to timely object to the ruling under Federal Rule of Civil Procedure 72(a) is without merit. That said, Plaintiff's briefs made clear that any request for fees and costs in connection with the motion to compel would be sought depending on the outcome of the additional production. That production came and went years ago, and so too did now-retired Judge Cox's supervision of discovery-related

matters such as this. No request for sanctions was made until Plaintiff filed this petition after trial. Due to the timing of this motion, the Court finds that it would be unjust to award Defendant these fees and costs post-trial. *See* Fed. R. Civ. P. 37(5)(A)(iii) (prohibiting courts from awarding fees and costs in connection with an order to compel if "other circumstances make an award of expenses unjust.").

More importantly, Judge Cox's statement that Plaintiff and Plaintiff's counsel were not to blame in light of the change in counsel at a crucial time in the case supports a finding that an award of fees and costs would be inappropriate. "Rule 37 sanctions are appropriate where a party displays willfulness, bad faith, *or* fault in violating his discovery obligations." *Oyebade v. Bos. Sci. Corp.*, No. 11 C 968, 2012 WL 4020971, at *2 (S.D. Ind. Sept. 12, 2012) (citing *Marrocco v. Gen. Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992)). In light of that statement, there does not appear to be any basis to attribute fault, much less willfulness of bad faith, for deficiencies with Plaintiff's original production. Accordingly, Rule 37 sanctions are inappropriate and Defendant's petition for fees and costs in connection with the motion to compel is denied.

### C.    **Defendant's Bill of Costs**

Last, Defendant seeks an award of $36,214.77 in costs under Federal Rule of Civil Procedure 54(d)(1). Plaintiff first objects on the basis that it, not Defendant, is the prevailing party. The Court has already rejected that argument and will not reconsider it here. Alternatively, Plaintiff objects to the per-page rates and attendance fees charged for depositions, the inclusion of costs for additional items such as word indexes, scanning exhibits, real time feeds, and certain unspecified copy costs for trial materials. In general, Plaintiff also argues that Defendant failed to satisfy is burden to show that the objected-to costs were reasonable and necessary to the litigation.

Federal Rule of Civil Procedure 54(a) establishes "a presumption that a prevailing party recovers costs." *Lane v. Pers.*, 40 F.4th 813, 815 (7th Cir. 2022). Recoverable costs under Rule 54 are delineated in 28 U.S.C. § 1920: (1) the fees of the clerk and marshal; (2) fees of court reporters for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court-appointed experts and interpreters. Taxing costs against a losing party involves two inquiries: "(1) whether the cost imposed on the losing party is recoverable [under § 1920] and (2) if so, whether the amount assessed for that item was reasonable." *Lane*, 40 F.4th at 815. Notwithstanding the "strong presumption in favor of awarding costs to the prevailing party[,]" the "court must review a proposed petition for costs in scrupulous detail." *Roney v. Ill. Dep't of Transp.*, No. 99 C 4941, 2007 WL 1100751, at *1 (N.D. Ill. Apr. 12, 2007) (internal quotations omitted). "Any party seeking an award of costs carries the burden of showing that the requested costs were necessarily incurred and reasonable." *Trs. of Chi. Plastering Inst. Pension Tr. v. Cork Plastering Co.*, 570 F.3d 890, 906 (7th Cir. 2009).

First, with respect to deposition transcripts, Plaintiff's objections as to the allowable per-page rates are well taken. *See* N.D. Ill. L.R. 54.1(b) ("If in taxing costs the clerk finds that a transcript or deposition was necessarily obtained, the costs of the transcript or deposition shall not exceed the regular copy rates as established by the Judicial Conference of the United States and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court."); N.D. Ill. General Orders 18-0011 (Apr. 19, 2018) & 23-0015

(May 19, 2023).[5] Defendant does not appear to have taken into account the rates in effect at the time of the deposition. Thus, to the extent Defendant seeks costs in excess of the allowable rates in effect at the time of the deposition, the amount will be adjusted accordingly.

The Court also generally sustains Plaintiff's objections to various additional costs (i.e., transcript word indexes, scanning exhibits, two deponents not called to testify at trial, attendance fees, deposition real time feeds, and unspecified trial materials) because Defendant failed to provide any explanation in support of the requests. *See, e.g.*, *Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, No. 20 C 5035, 2023 WL 5804232, at *6 (N.D. Ill. Sept. 7, 2023) (declining to award certain costs because the party "provided almost no explanation as to what the various charges in this category represent and why each was reasonably necessary . . . ."); *see also Williams v. Schwarz*, No. 15 C 1691, 2018 WL 4705558, at *2 (N.D. Ill. Oct. 1, 2018) ("Recognizing that charges for copies of exhibits made for attorney convenience are not recoverable . . . , courts have declined to award charges for exhibit costs where the prevailing party failed to show the exhibits 'were anything other than extra copies of documents already within their possession.'") (quoting *Boyle v. Torres*, No. 09 C 1080, 2011 WL 899720, at *2 (N.D. Ill. Mar. 15, 2011)).

Taking into account the objections sustained above and having reviewed each invoice and Defendant's summary calculation of reimbursement in comparison to Plaintiff's calculation of allowable reimbursement, the Court finds Plaintiff's calculation to be accurate. (*Compare* Bill of Costs, Ex. A, *with* Obj., Ex. C, Dkt. 205-3). Accordingly, Defendant is entitled to a total of

---

[5] General Order 18-0011 provides transcript rates per page for all transcripts requested on or after April 20, 2018. General Order 23-0015 provides transcript rates for all transcripts requested after October 1, 2023. The Court assumes the transcripts at issue in this case are ordinary, 30-day transcripts.

$10,064.60 for deposition transcript costs and attendance fees, plus $8,433.75 for trial transcripts, for a total of $18,498.35.

## **CONCLUSION**

For the reasons stated above, Plaintiff's renewed motion for judgment as a matter of law (Dkt. 200) is granted in part and denied in part; Plaintiff's motion for a new trial (Dkt. 201) is denied; Defendant's petition for fees and costs (Dkt. 197) is denied; Plaintiff's petition for fees and costs (Dkt. 213) is denied; and Defendant's bill of costs (Dkt. 196) is granted in part. The Clerk is directed to tax costs in favor of Defendant in the amount of $18,498.35.

**DATED**: January 29, 2026                    **ENTERED**:

LaShonda A. Hunt
United States District Judge